UNITED STATES DISCTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Miami Division

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

UNITED STATES OF AMERICA f/u/b/o
WESCO DISTRIBUTION, INC.

      Plaintiff, Counter-Defendant,

vs.

AMERICAN      BRIDGE      COMPANY,
LIBERTY      MUTUAL      INSURANCE
COMPANY  and  ST.  PAUL  FIRE  AND
MARINE INSURANCE COMPANY,

      Defendants,

vs.

ELECTRIC MAINTENANCE &
CONSTRUCTION, Inc.,

      Defendant and Counter-Plaintiff,     /

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND
## MEMORANDUM OF DECISION ON THE MERITS AND ORDER

      This matter was tried to the Court without a jury on January 22 through January 24, 2007.

The Court issues its Findings of Fact, Conclusions of Law and Memorandum of Decision on the

Merits and Order pursuant to Rule 52(a), Fed.R.Civ.P., and sets forth hereinbelow the Court's

Findings of Fact and Conclusions of Law.

      As the Court stated at the conclusion of the trial on January 24, 2007, the Court approves

and adopts portions of the parties' Joint Pretrial Stipulation (D.E. 86), as follows:

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

## STATEMENT OF THE CASE

This case involves a contract dispute for electrical equipment that was supplied for a construction project. Intervenor Plaintiff, Electric Maintenance & Construction, Inc. ("EMC"), is an electrical subcontractor. EMC and American Bridge Company ("American Bridge") entered into a contract, wherein EMC agreed to furnish and install certain electrical work at the Key West Naval Air Station, Truman Harbor repairs construction project, located in Key West, Florida (the "Project"). Subsequent thereto, EMC entered into an agreement with Plaintiff, WESCO Distribution, Inc. ("WESCO"), wherein WESCO agreed to furnish certain electrical equipment for use and incorporation into EMC'S work at the Project (the "EMC-WESCO Agreement").

Contending that certain of the materials that WESCO supplied to EMC for the Project were not in compliance with the EMC-WESCO Agreement, EMC ultimately did not pay WESCO the full amount which WESCO invoiced to EMC for the equipment that WESCO supplied. Initially, WESCO brought suit against American Bridge and its sureties, Liberty Mutual Insurance Company ("Liberty") and St. Paul Fire and Marine Insurance Company ("St. Paul") for claims under the Federal Miller Act. EMC was later permitted to intervene in this action, and on or about February 6, 2006, filed its Intervenor's Complaint herein. WESCO answered and filed a counterclaim to same on or about March 13, 2006. On October 24, 2006, this Court granted American Bridge, Liberty Mutual, and St. Paul's Motion for Partial Summary Judgment, dismissing with prejudice WESCO's claims under the Miller Act against those parties. Remaining for decision in the instant action is EMC's breach of contract claim against WESCO, and WESCO's counterclaim thereto.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

EMC contends that WESCO failed to comply with the Naval specifications and otherwise perform under its agreement with EMC, by, for example, supplying incorrect, incomplete, defective and/or deficient materials for incorporation into the Project. As a result of these alleged failures, EMC asserts that it incurred substantial expense for which it seeks a set-off against any balance that might be due and owing to WESCO.

WESCO contends that the electrical equipment it supplied to EMC for the Project was proper and in compliance with the requirements of the EMC-WESCO Agreement. WESCO contends that EMC materially breached the EMC-WESCO Agreement by failing to pay WESCO for the materials supplied under the EMC-WESCO Agreement. WESCO contends that EMC owes WESCO the principal amount of not less than Three Hundred Four Thousand Four Hundred Fifty-Three and 70/100 Dollars ($304,453.70) for the equipment supplied by WESCO to EMC, plus interest and attorneys' fees.

## THE BASIS OF FEDERAL JURISDICTION

The Court agrees with and adopts the Basis of Federal Jurisdiction set forth by the parties in the Joint Pretrial Stipulation, as follows:

This Court has diversity jurisdiction under 28 U.S.C. 1332 over the claims that remain herein because (1) there is complete diversity of citizenship between Intervenor EMC and Defendant in Intervention and Counterclaimant WESCO, and (2) the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

## THE PLEADINGS RAISING THE ISSUES

The Court also agrees with and adopts Part III of the Joint Pretrial Stipulation with respect to the pleadings raising the issues, as follows:

1.  EMC's Intervenor's Complaint dated December 28, 2005

2.  WESCO's Answer to EMC's Intervenor's Complaint and Counterclaim against EMC dated February 6, 2006

3.  Intervenor's Answer to WESCO's Counterclaim dated March 13, 2006

4.  Intervenor's Amended Affirmative Defenses to WESCO's Counterclaim dated May 4, 2006

## STATEMENT OF UNCONTESTED FACTS

1.  On or about April 30, 2003, American Bridge, as general contractor, entered into a contract with the United States Navy (the "Owner") to provide construction services at the Key West Naval Air Station, Truman Harbor Repairs, located in Key West, Florida, Contract No.: N62467-03-C0154 (the "Project").

2.  American Bridge subsequently entered into an agreement with EMC, whereby EMC agreed to provide labor, material, and equipment to furnish and install designated electrical work at the Project.

3.  Subsequent thereto, the EMC-WESCO Agreement was executed, which called for the delivery by WESCO of switchgears and electrical materials and supplies for EMC's use and incorporation into the Project.

4.  In furtherance of WESCO's obligations under the EMC-WESCO Agreement, WESCO shipped materials to EMC care of the project from approximately April 14, 2004 to

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

approximately May 5, 2005.

     5.     EMC made payments to WESCO as follows:

| **DATE** | **CHECK NO.:** | **AMOUNT** |
|---|---|---|
| July 6, 2004 | 13696 | $268,958.23 |
| August 20, 2004 | 13981 | $18,248.78 |
| October 11, 2004 | 12465 | $332,368.48 |
| December 27, 2004 | 12926 | $171,323.55 |
| January 18, 2005 | 14036 | $67,749.25 |
| March 9, 2005 | 14331 | $296,034.13 |
| March 9, 2005 | 14332 | $3,752.46 |
| TOTAL | | $1,158,434.88 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the conclusion of the trial on January 24, 2007, the Court orally stated for the record certain findings of fact and conclusions of law. The Court adopts and incorporates those findings and conclusions and hereby amplifies and supplements them as follows.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

## FINDINGS OF FACT

1.    WESCO is a Delaware corporation with its principal place of business in Pennsylvania.

2.    EMC is a Florida corporation with its principal place of business in Florida.

3.    The aforesaid subcontract between American Bridge as general contractor and EMC as the electrical subcontractor was dated August 11, 2003 (EMC Ex. 3).

4.    EMC solicited bids from and negotiated with different electrical equipment manufacturers including Eaton Electrical, Inc. (also known as Cutler-Hammer) to provide electrical equipment which EMC was required to provide for the Project under its contract with American Bridge. Ultimately, an agreement was reached between EMC and Eaton Electrical, Inc. ("Eaton") whereby Eaton, also known as Cutler-Hammer, would furnish Eaton/Cutler-Hammer electrical equipment to EMC for the job.[1]

5.    Mr. Ed Roseman, president and owner of EMC, conducted the negotiations with Mr. Bob Gaitens, senior sales engineer for Eaton, for the electrical equipment to be supplied by Eaton/Cutler-Hammer for the Project. The price agreed upon between Mr. Roseman on behalf EMC and Mr. Gaitens on behalf Eaton was $1,300,000.

6.    However, EMC did not contract directly with Eaton. Rather, due to Eaton's distribution system, EMC contracted with WESCO, an authorized distributor of Eaton/Cutler-Hammer products. The contract between EMC and WESCO took the form of a Purchase Order,

---

[1] As Bob Gaitens, senior sales engineer for Eaton testified, "Cutler-Hammer" is a trade name for certain electrical equipment made by Eaton.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

which is dated October 16, 2003, in the agreed amount of $1,300,000. (See pages 3-4, EMC Ex. 50).

7.      During the course of the Project, EMC ordered additional materials from WESCO, over and above the equipment called for in the original Purchase Order, and WESCO furnished that additional material.

8.      A description of the Project is appropriate to a proper understanding of the dispute.  The portion of the Project in question involved the installation of electrical equipment to provide ship-to-shore power for vessels at the Mole Pier at the Naval Station in Truman Harbor.

9.      Under the contract between WESCO and EMC, WESCO furnished only materials and electrical equipment for the job.  WESCO was not required to, and did not, provide any labor for the job.  All labor for the installation and testing of the electrical materials and equipment was the responsibility of EMC.

10.     The major electrical equipment items supplied by WESCO to EMC were low voltage switchgear, unit substation transformers, pad mounted transformers, and electrical switches referred to as SF6 switches.  WESCO had two major suppliers for the equipment which it furnished to EMC.  Eaton/Cutler-Hammer supplied the low voltage switchgear and  the unit substation transformers.  LG Associates furnished to WESCO the pad mounted transformer and the SF6 switches.  The SF6 switches, furnished by LG Associates, were manufactured  by S&C Electric Company, and the pad mounted transformers LG Associates provided were manufactured by ABB.

–7–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

11.    In addition to WESCO, EMC had another major supplier of electrical equipment for the job.   Specifically, ESL Power Systems furnished the "igloos" and communication boxes to EMC for use on the job.  The "igloos" are the receptacles that the vessels plug into to obtain shore power.

12.    The equipment furnished by WESCO was to be used for four separate substations known as substations 1, 2, 3 and 4.  Each substation had a pad mounted transformer made by ABB, an SF6 switch made by S&C Electric, and low voltage switchgear manufactured by Eaton which was coupled with the unit substation transformer.

## *EMC'S CLAIMS*

13.    The parties stipulated that the remaining unpaid principal balance on WESCO's invoices to EMC for materials supplied by WESCO to EMC for the Project is $304,453.70.  This is the principal amount which WESCO would be entitled to recover from EMC unless EMC is able to establish its entitlement to any reduction or set-off by virtue of its claims that the equipment was defective or nonconforming and/or did not meet the Navy specifications.

14.    EMC's claims against WESCO, and the amounts of its claims, have vacillated and have been inconsistent during the Project and in these proceedings.  For example, on cross examination Mr. Roseman, president and owner of EMC, admitted that in January 2005 he claimed EMC's damages were approximately $167,147, whereas two months later in March 2005, he claimed that EMC'S damages were approximately $194,000.  After WESCO filed this lawsuit in August 2005 to recover $304,453.70 on the invoices, the Initial Disclosures dated January 17, 2006 (D.E. 50), which were filed into the record of this action,  contained an Exhibit

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

"A" thereto which set forth an itemized list of EMC's claimed damages as of August 12, 2005

which totaled $318,197. When his deposition was taken in this action in August 2006, Mr.

Roseman submitted a revised Exhibit "A" claiming EMC's damages were approximately

$315,000. In its "final" exhibit book furnished to WESCO's counsel on Friday, January 19,

2007, and to this Court at the commencement of the trial, EMC submitted Exhibit 133 in which

EMC claimed its damages were $367,509. On the morning of trial, EMC submitted its proposed

Findings of Fact and Conclusions of Law which itemized its claimed damages in the amount of

$241,582.21.

     15.    The Court finds no fault with counsel for the vacillating and inconsistent amounts

claimed by EMC. Rather, the Court finds that EMC's attorneys were acting on the instructions

of Mr. Roseman, who varied from time to time as to what he thought the amount of the claim

was. Mr. Roseman's vacillation and inconsistency as to the amount of the claim is but one of a

number of matters, some of which will be discussed in more detail below, which cause the Court

to question Mr. Roseman's credibility.

     16.    On page 3 of its proposed Findings of Fact and Conclusions of Law submitted

to the Court at the commencement of the trial, EMC listed 19 separate items setting forth its

claims against WESCO and for which EMC contends it is entitled to a set-off against the unpaid

amount of WESCO's invoices. Those 19 items submitted for trial were as follows:

| 1 | REPAIR SWITCHGEAR | $1,803.50 |
|---|---|---|
| 2 | ASSEMBLY S.S. 1-2-3 | $4,575.00 |

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

| 3 | INTERNAL L.V. SWITCHGEAR | $1,785.00 |
| 4 | CE TESTING/REPAIR SUBSTATION | $60,465.00 |
| 5 | SUBSTATION #4 LAYOUT COST | $39,951.77 |
| 6 | SUBSTATION #4 DEMO. | $29,561.38 |
| 7 | RENT GENERATOR (SUBSTATION #3) | $2,934.44 |
| 8 | SUPPLY LUG FOR TERMINATION L.V. | $9,032.46 |
| 9 | FOOD & HOUSING | $17,088.20 |
| 10 | MATERIALS | $475.50 |
| 11 | MATERIALS/STAND OFF | $1,040.04 |
| 12 | OVERCURRENT PROTECTION | $9,542.20 |
| 13 | HARDWARE FOR DOORS | $8,542.88 |
| 14 | 3-POINT LATCHING | $4,161.35 |
| 15 | LIGHTNING ARRESTORS | $10,150.90 |
| 16 | RUBBER SEALS | $1,545.95 |
| 17 | STAINLESS STEEL BRACING | $7,129.13 |

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

| 18 | REPLACE MILD STEEL | $7,802.51 |
| 19 | ADDITIONAL HOME OFFICE | $23,955.00 |

17.    The foregoing items for which EMC claimed at trial it is entitled to a set-off

total $241,542.21[2].

18.    In addition to the 19 specific items listed above, there were two additional items

for which EMC claims it is entitled to a set-off which were also tried to the Court.  One item was

the so called "DOOR HOLDER" for which EMC claimed a set-off in the amount of $9,633.29,

and the other item was for alleged SHIPPING DAMAGE, but no amount was ever specified for

that item.

19.    During trial, WESCO accepted responsibility for five specific items on the

foregoing list, specifically:

| 11. | MATERIALS/STAND OFF | $1,040.04 |
| 13. | HARDWARE FOR DOORS | $8,542.88 |
| 14. | 3-POINT LATCHING | $4,161.35 |
| 16. | RUBBER SEALS | $1,545.95 |
| 17. | STAINLESS STEEL BRACING | $7,129.13 |

20.    The total amount of the items for which WESCO accepts responsibility is

$22,419.35.  WESCO stipulated that that amount is a proper set-off from the unpaid invoices

---

[2] EMC's proposed Findings of Fact and Conclusions of Law claim the amount totals
$241,582.21, but the Court finds that is a simple, and minor, $40 error in addition.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

totaling $304,453.70. As a result, WESCO claims that the principal amount owed by EMC is

$282,034.35.

21.     At the conclusion of the trial, EMC, through its counsel, conceded that there

was no evidence to support six of the specific items claimed by EMC on the list set forth above.

Specifically, EMC conceded that there was no evidence to support the following specific claims

contained in EMC's list set forth above:

| 1. | REPAIR SWITCHGEAR | $1,803.50 |
| 2. | ASSEMBLY S.S. 1-2-3 | $4,575.00 |
| 3. | INTERNAL L.V.SWITCHGEAR | $1,785.00 |
| 7. | RENT GENERATOR (SUBSTATION #3) | $2,934.44 |
| 9. | FOOD & HOUSING | $17,088.20 |
| 10. | MATERIALS | $475.50 |

22.     The foregoing six items, as to which EMC concedes that no evidence was

introduced to support the specific claims, total $28,661.64. Even if EMC had not conceded that

there was no evidence to support these six specific items totaling $28,661.64, the Court would

find, and does find, that there is no evidence to support these six specific claims.

23.     In addition to the six specific items listed above, EMC also conceded that *Item*

*#18* - REPLACE MILD STEEL in the amount of $7,802.51 was not an item properly chargeable

to WESCO, but rather was a problem caused by a third party, O.C. Door Company, which is not

the responsibility of WESCO and which is not a proper set-off against the unpaid WESCO

invoices. Even in the absence of that concession, the Court would find, and does find, that the

–12–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

$7,802.51 reflected as *Item #18* in the above list was a problem caused by O.C. Door Company, and is not a proper set-off from the amount owed by EMC to WESCO.

24.     In addition to the foregoing concessions by both parties, there was one additional partial concession by EMC, specifically with respect to *Item #19* on the above list - ADDITIONAL HOME OFFICE - in the amount $23,955. At the conclusion of the trial, EMC conceded that there was no evidence to support the full amount of $23,955 claimed for that item, but EMC did argue that there was evidence, in the form of testimony from Mr. Roseman, to support a set-off for that item in the amount of $9,375. EMC contended that Mr. Roseman testified that he should be allowed to set-off 75 hours of his time at the rate of $125 per hour for a total of $9,375. The Court rejects that testimony, which will be discussed below, but does note that EMC's partial concession with respect to this item further reduces the amount of EMC's claimed set-offs which were presented for trial by $14,580 ($23,955 less $9,375). Even if EMC had not conceded that there was no evidence to support $14,580 of that claimed $23,955 item, the Court would find, and does find, that there was not any evidence to support $14,580 of that claimed set-off.

25.     Thus, to summarize, EMC in its list of 19 specific items set forth above which were tried, plus the two additional items which were also tried and not set forth in that list ("DOOR HOLDER" in the amount of $9,633.29 plus SHIPPING DAMAGE, no amount specified), EMC claimed set-offs totaling $251,175.50 (consisting of $241,542.21 from the 19 enumerated items plus $9,633.29 for the "DOOR HOLDER").

26.     WESCO accepted responsibility for five specific items set forth above totaling

−13−

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

$22,419.35. Additionally, EMC conceded during closing argument that there was no evidence to support claimed set-offs on the foregoing list of claims totaling $43,241.64 (consisting of *Items #1, 2, 3, 7, 9, 10*, and $14,580 of the amount claimed *Item #19*). EMC also conceded that the amount of $7,802.51 in *Item #18* was not a proper set-off against WESCO. Thus, EMC conceded, and the Court so finds, that the foregoing items totaling $51,044.15 in claimed set-offs on EMC's list are not proper set-offs.

27.    In summary:

| | |
|---|---|
| Total set-offs claimed by EMC in its list of 19 enumerated items plus the two additional items tried: | $251,175.50 |
| Less items for which WESCO accepted responsibility: | -$22,419.35 |
| Less items conceded by EMC, and found by the Court, to be unsupported or improper claimed set-offs: | -$51,044.15 |
| Balance in dispute: | $177,712.00 |

28.    Thus, at the conclusion of the trial, there were only seven items in dispute on EMC's list of 19 items set forth above, specifically *Items 4, 5, 6, 8, 12, 15, and part of 19*, plus the two unlisted items regarding the "DOOR HOLDER" and "SHIPPING DAMAGE", which total $177,712. The Court will now address those items.

### *ITEM 4: CE TESTING/REPAIR SUBSTATION - $60,465*

29.    This item concerns alleged charges to EMC by a third party, CE Testing, which is a testing company hired by EMC to perform independent testing on the equipment required by

−14−

the Navy specifications. EMC claimed, through the testimony of Mr. Roseman, that these were charges to repair deficiencies in the electrical equipment supplied by WESCO. WESCO contended that these were charges for independent testing and protective relay programming, which were the responsibility of EMC, not WESCO.

30.     The Court finds that it was EMC's obligation to provide the independent testing and to provide the programming for the protective relays, and that any attempted set-offs by EMC for these items is improper. The Court further finds that there is no credible evidence to support EMC's claim that the alleged $60,465 set-off was to correct deficiencies in the equipment furnished by WESCO.

31.     EMC was required to comply with the Navy specifications for the Project which were introduced into evidence as WESCO Ex. 5.

32.     Section 16081N, Part 1.4.1 of the Navy specifications require: "Contractor shall engage the services of a qualified testing organization to provide inspection, testing, calibration, and adjustment of the electrical distribution system equipment listed in paragraph entitled 'Acceptance Tests and Inspections' herein." (WESCO Ex. 5). Part 3.1 of Navy Specification 16081N refers to the various other sections of the Navy specifications which describe and set forth the required testing and inspections. This required independent testing and inspections are performed after all of the equipment is fully assembled in order to make sure everything is in proper working order before the equipment is energized. The Navy specifications contain at least 28 pages describing the required testing and inspections. (WESCO Ex. 5: Navy specifications §16272N, Part 3.5, pp. 11-13; §16302N, Part 3.2, pp. 19-22;

−15−

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

§16341N, Part 3.4, pp. 5-8; §16360N, Part 3.5, pp. 11-15; §16402N, Part 3.2, pp. 13-14; §16442N, Part 3.5, pp. 11-18). Part of the contractor's testing and inspection obligations under the Navy specifications is the requirement to program the relay settings of the Basler protective relays. (WESCO Ex. 5, §16442N, Part 3.5.1.6(a)(5), p.17)

33.     This extensive testing and inspection was solely the responsibility of EMC. Mr. Mitchell Harrell was one of EMC's supervisors for the Project. Mr. Harrell testified during the trial and, for the most part, the Court found him to be an honest and truthful witness, although there were some matters about which he testified, as will be noted later, which lead the Court to find he was simply mistaken. Although he was the supervisor on the job, Mr. Harrell admitted that he never did read the Navy specifications regarding the independent testing and inspection requirements imposed upon EMC. Rather, Mr. Harrell testified that EMC hired Mr. Nat Crews of CE Testing to perform that work, which was very extensive.

34.     While Mr. Harrell did testify that some pinched wires were found by CE Testing which caused shorts, there was no evidence whether the pinched wires existed at the time of delivery to EMC, or whether that condition arose after delivery to EMC. Moreover, Mr. Harrell did not testify about the time or the expense required to correct that condition. Mr. Harrell testified that he kept a daily log on the Project, but his log was not introduced into evidence. Mr. Harrell testified that he regularly took photographs on the job, but no photographs were introduced to document the pinched wires.

35.     The only evidence introduced by EMC to support the amount claimed in *Item #4* was the unsubstantiated and unsupported testimony of Mr. Roseman. This item in the amount of

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

$60,465 was a very substantial portion of the $177,712 total which was ultimately in dispute at trial. Mr. Roseman testified that there were several invoices submitted by CE Testing to EMC, supposedly to repair deficiencies in the equipment supplied by WESCO. However, there were no invoices from CE Testing admitted into evidence to support this claim. Moreover, neither Nat Crews, nor anyone else from CE Testing, was called as a witness to testify in support of this claim.

36.     Mr. Roseman admitted in his testimony that he was not present and did not witness the work performed by Nat Crews or CE Testing, except on one isolated incident when he claimed that he was present while Mr. Crews allegedly showed him some problems with substation 2. With respect to  that occasion, Mr. Roseman testified that Mr. Crews showed him that the racking of one 3200 amp breaker bound control wiring and created shorts, that the connectors were not properly connected, and that the control wiring management on the switchgear was put together "very sloppy." Mr. Roseman also testified that the Basler relays were delivered without any logic, which was corrected by CE Testing. The Court does not accept Mr. Roseman's testimony in these matters. The Court finds that, for the most part, Mr. Roseman was not a credible witness, and for the most part, his testimony was not reliable or trustworthy.

37.     Even if Mr. Roseman's testimony in this regard were to be accepted by the Court and not rejected, no evidence was introduced to establish that the alleged problems were caused in the manufacture of the equipment and existed at the time of delivery, as opposed to being created subsequent to delivery to EMC. Moreover, no evidence was introduced to establish the

amount charged by CE Testing to repair those four specific alleged deficiencies, even assuming the alleged deficiencies existed at the time of delivery to EMC.

38.    EMC did attempt to introduce one invoice from CE Testing in the amount of $30,225 which, according to the invoice, purported to be for "Cutler Hammer Repairs." Since Mr. Roseman had no personal knowledge of the alleged repairs encompassed by that alleged invoice, it was  excluded from evidence on the grounds of hearsay.  As noted, EMC did not call Nat Crews or any other witness from CE Testing to testify about what was encompassed in those alleged repairs.  Further,  there was no evidence whatsoever introduced by EMC as to any amounts which EMC paid, if any, to CE Testing for alleged repairs or for any other work performed by CE Testing.

39.    In sum, the Court finds that there is no credible evidence to support EMC's claim for a set-off on *Item #4* in the amount of $60,465.

### *ITEMS 5 AND 6: SUBSTATION # 4 LAYOUT COST ($39,951.77) AND SUBSTATION # 4 DEMO. ($29,561.38)*

40.    These two items for which EMC claims set-offs totaling $69,513.15 both relate to the issue concerning the concrete pad for substation 4.  This is known as the "orientation" or "layout" issue on pad 4.

41.    EMC claims that it was backcharged $29,561.38 by the general contractor, American Bridge, to demolish and reconstruct the concrete pad for substation 4.  EMC also claims that it incurred an additional $39,951.77 in expenses in connection with electrical work related to demolishing and reconstructing the concrete pad for substation 4.  EMC seeks to set off these amounts against the unpaid invoices it owes WESCO.

–18–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

42.     EMC claims that these charges were incurred because the electrical equipment built by Eaton/Cutler-Hammer, which was part of the original Purchase Order between EMC and WESCO, was not built and delivered in accordance with the original Navy plans and specifications for substation 4. EMC prepared the layout drawings for the concrete pad for substation 4 in accordance with the original Navy plans and specifications. The concrete pad for substation 4 was built before the electrical equipment was delivered to the job site. The equipment when delivered did not coincide with the concrete pad for substation 4. The Navy, through its engineer URS, required that the concrete pad for substation 4 be demolished and reconstructed. After that occurred, the electrical equipment was installed as built and delivered on the reconstructed pad for substation 4.

43.     EMC claims that the expenses in question should be borne by WESCO because Eaton/Cutler-Hammer made a mistake when it built the electrical equipment for substation 4. The Court rejects EMC's claim for any set-off with respect to the charges in question. The Court finds that the expenses were caused by EMC's own failure to prepare the layout drawings for the concrete pad for substation 4 in accordance with the submittals approved by the Navy engineers. In addition to rejecting EMC's claim in its entirety for these items on the merits of the claim, the Court also rejects EMC's claims in this respect because EMC failed to prove that the amounts claimed were actually incurred.

44.     This "orientation" issue was sharply disputed by the parties during trial, and there was a significant amount of evidence presented on this issue. The Court will address this matter in some detail.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

45.     The parties agree, and the Court finds, that the original Navy plans and specifications called for a "left to right" orientation on substations 1, 2 and 3, meaning that when one is standing in front of and facing the equipment, the unit substation transformer is on the left and the switchgear is on the right. Both parties agree, and the Court finds, that the original Navy plans and specifications called for a different orientation on substation 4, namely a "right to left" orientation whereby the unit substation transformer was to be located on the right side and the switchgear on the left side.

46.     The original Navy plans and specifications also provided for the unit substation transformers to be connected to the switchgear by means of cabling. Mr. Bob Gaitens of Eaton suggested to Mr. Roseman of EMC a "value engineering" concept, whereby the cabling connection would be eliminated and, instead, the unit substation transformers would be "close coupled" to the switchgear, resulting in the two pieces of equipment sitting side by side and connected without the extensive cabling required under the original plans and specifications.

47.     Mr. Roseman advised Mr. Gaitens that the proposed change was acceptable to EMC provided the Navy would approve. Subsequently, Mr. Gaitens discussed this proposed change with Mr. Garret Kerly of URS, who was serving as the Navy engineering firm on the Project. Mr. Kerly suggested that the requested change be submitted in writing. The requested change was submitted by the general contractor, American Bridge, to URS, and was approved by URS on behalf of the Navy. The equipment was subsequently built and delivered with the "close coupled" connection between the unit substation transformers and the switchgear and was accepted by the Navy.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

48.      Early in the process, Mr. Gaitens also suggested to Mr. Roseman that the orientation of substation 4 be changed to "left to right" instead of "right to left" so that the orientation on all four substations would be the same. Again, Mr. Roseman responded that the proposed change was acceptable to EMC provided it was acceptable to the Navy. Thereafter, Mr. Gaitens discussed the proposed change in the orientation for substation 4 with Mr. Kerly of URS. Mr. Kerly advised Mr. Gaitens to submit the proposed change in the orientation of substation 4 on the submittals.

49.      Submittals were required on the Project to show the Navy exactly what the various contractors and manufacturers proposed to deliver to the Navy for the Project. The purpose, of course, was to make sure that what the contractors and manufacturers proposed to deliver to the Navy for the Project was acceptable to the Navy. Once the submittals for the proposed equipment were approved by the Navy, then the equipment was required to be built in accordance with the approved submittals.

50.      The submittal process follows the chain of command. In this case, Eaton/Cutler-Hammer prepared its drawings of the electrical equipment which it intended to build and furnished those drawings, or submittals, to the electrical subcontractor, EMC. EMC, in turn, submitted the Eaton/Cutler-Hammer drawings to the general contractor, American Bridge, which in turn submitted them to the Navy engineers, URS. When URS approved and/or commented on the various submittals, URS forwarded its approval and/or comments to American Bridge. American Bridge, in turn, forwarded the URS approval and/or comments for the electrical

–21–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

portion of the Project to EMC which, in turn, forwarded them to Eaton/Cutler-Hammer and/or WESCO.

51.     The Eaton/Cutler-Hammer submittals for the electrical equipment for substation 4 showed the "left to right" orientation for the substation 4 transformer and switchgear in accordance with Mr. Gaitens' suggested change and in accordance with Mr. Kerly's request that the proposed change be shown on the submittals.  Mr. Roseman testified that the Eaton/Cutler-Hammer submittals for the electrical equipment for substation 4 were never submitted to EMC, but rather were submitted by Mr. Gaitens directly to the Navy engineers.  Mr. Roseman also testified that the Navy engineers never approved the Eaton/Cutler-Hammer submittals for the electrical equipment for substation 4.  Mr. Roseman's testimony was contrary to the testimony of Mr. Gaitens and was contrary to the documentary evidence.  The Court rejects Mr. Roseman's testimony on both points as not credible.

52.     The Court finds the testimony of Mr. Gaitens to be credible and reliable.  Mr. Gaitens testified, and the Court finds, that on three separate occasions Eaton/Cutler-Hammer delivered its submittals to EMC showing the "left to right" orientation of the substation transformer and switchgear for substation 4.  On each of those three occasions, Mr. Gaitens personally delivered the submittals to EMC.

53.     The first submittal in question is WESCO Ex. 22.  It is an assembly drawing for the switchgear for substation 4 and clearly shows the "left to right" orientation, with the substation transformer on the left and the switchgear on the right.  This assembly drawing was

–22–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

part of the submittal package which Mr. Gaitens personally delivered to Mr. Lee Konner of EMC in December 2003.

54.     That drawing was part of the submittal package delivered by EMC to American Bridge which, in turn, delivered same to URS.  Although that submittal package was not ultimately accepted by URS on behalf of the Navy because of a so-called "stainless steel" issue, the Navy engineers did not reject the "left to right" orientation for substation 4.  (WESCO Ex. 21).[3]

55.     Eaton/Cutler-Hammer prepared a second submittal package in February 2004, which Mr. Gaitens again personally delivered to EMC.  The assembly drawing for the switchgear for substation 4, which was part of that submittal package, again clearly shows the "left to right" orientation for substation 4.  American Bridge, EMC and Eaton/Cutler-Hammer jointly decided not to submit that submittal package to URS because of the impasse at that time between those three parties and URS on the "stainless steel" issue.  Nevertheless, EMC did have that assembly drawing from Eaton/Cutler-Hammer showing the "left to right" orientation.

56.     Eaton/Cutler-Hammer's final submittal package for the switchgear included WESCO Ex. 24.  Mr. Roseman testified this document was a "schematic."  The Court rejects that testimony.  The Court finds, as Mr. Gaitens testified, that WESCO Ex. 24 is an assembly drawing for the switchgear for substation 4.  It clearly shows the "left to right" orientation of the substation transformer and the switchgear for substation 4.  Mr. Gaitens personally delivered multiple copies of the Eaton/Cutler-Hammer submittal package, containing WESCO Ex. 24, to

---

[3] The "stainless steel" issue is not an issue between the parties in this case.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

Mr. Lee Konner of EMC.  Mr. Konner kept two sets of the submittal package containing WESCO Ex. 24, and asked Mr. Gaitens to deliver six copies of that submittal package to Mr. Steve Renner of American Bridge.  In compliance with Mr. Konner's request, Mr. Gaitens shipped six copies of that submittal package by Federal Express to American Bridge.

57.     URS, on behalf of the Navy, approved the Eaton/Cutler-Hammer submittal containing WESCO Ex. 24.  The URS approval is dated 17 May 2004 and is part of WESCO Ex. 25.  Thus, the Navy, through its engineers, approved the "left to right" orientation for substation 4.[4]

58.     By letter dated May 19, 2004, American Bridge forwarded the URS approval of the Eaton/Cutler-Hammer submittal for the switchgear to Mr. Roseman of EMC.  That letter states in part:

> "Pursuant to our previous correspondence and *in accordance with the returned submittal*, it is American Bridge's understanding that EMC and it's [sic] supplier(s) are immediately commencing with the fabrication of the low voltage electrical switchgear." (WESCO Ex. 25). [Italics added].

59.     Thus, EMC clearly had notice and knowledge that the Navy had approved the "left to right" orientation for the substation transformer and switchgear for substation 4.  After EMC received from American Bridge the URS approval of the switchgear for substation 4, EMC issued instructions to WESCO to have Cutler-Hammer build the switchgear in accordance with the approved submittals. (WESCO Ex. 20). EMC's  instructions dated May 27, 2004 state in part:

---

[4] URS noted one exception to its approval, but that exception is not relevant to this case.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

"Release for immediate shipment as per approved submittal from the Navy to Cutler Hammer the low voltage switch gear. Also, release all additional switch gear per approved submittals. All of switch gear is now released for immediate shipment. Verify with Bob Gaitens on approved submittals and entire switch gear package is now released for production and shipment." (WESCO Ex. 20)

60.    In addition to approving the switchgear submittal with the "left to right" orientation on substation 4, the Navy engineers also approved the Eaton/Cutler-Hammer submittal for the unit substation transformer which also showed the "left to right" orientation for substation 4. The Eaton/Cutler-Hammer submittal for the unit substation transformer included drawing #PA1443401, which is located immediately behind the blue tab in WESCO Ex. 21. The pages immediately following that drawing in WESCO Ex. 21 contain the URS approval for the unit substation transformer. Paragraph 3a on the last page of WESCO Ex. 21 contains the URS approval with respect to the unit substation transformer:

"Unit substation transformers are approved as noted."

61.    After receipt of notice of approval of the submittal for the unit substation transformer (which was received before the approval of the submittal for the switchgear), EMC issued written instructions on April 22, 2004 to WESCO to proceed with the unit substation transformer "per approved submittals." (WESCO Ex. 19).

62.    Eaton/Cutler-Hammer built and delivered the unit substation transformer and switchgear for substation 4 in accordance with the "left to right" orientation pursuant to the approved submittals.    The Court finds that the approved submittals became part of the specifications and that the equipment must be built and delivered in accordance therewith. Sue

–25–

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

McKnight, a Naval officer involved with the Project, e-mailed Steve Renner and others at American Bridge on October 27, 2004, as follows:

> "Please build switchgear and pad as per specifications and accepted relevant submittals (which become part of the specifications at acceptance) to date." (EMC Ex. 88).

63.     EMC was required as part of its scope of work to prepare the layout drawings for the concrete pad for substation 4. Those drawings were admitted into evidence as EMC Ex. 77. Mr. Doug Dunbar of EMC prepared those drawings, but he was not called to testify. The layout drawings prepared by EMC for the concrete pad for substation 4 did not coincide with the approved "left to right" orientation in the submittals for the switchgear and transformer. Rather, EMC erroneously prepared the pad layout drawings with the original "right to left" orientation for substation 4.

64.     Mr. Gaitens testified that he had a "plethora" of conversations with Mr. Doug Dunbar and Mr. Lee Konner of EMC after URS approved the Eaton/Cutler-Hammer switchgear submittals. Mr. Konner and Mr. Dunbar called Mr. Gaitens with questions on numerous occasions, and Mr. Gaitens testified he told those gentlemen to pay attention to the submittals because they were important and, most notably, because the orientation had been changed on substation 4. The Court finds Mr. Gaitens' testimony credible and accepts it.

65.     By facsimile transmission dated May 19, 2004, American Bridge notified Mr. Roseman of EMC that American Bridge was ordering the reinforcing steel for the pads for all four substations, and that the size of the pads was based upon the "switchgear submittals."

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

(WESCO Ex.64). In that same facsimile, American Bridge placed EMC on notice that any future pad changes resulting in increased costs would be borne by EMC.

66.     The Court finds that the costs associated with demolishing and reconstructing the concrete pad for substation 4 were caused by EMC's negligence and error in submitting pad layout drawings with the "right to left" orientation for substation 4 instead of submitting layout drawings with a "left to right" orientation for that substation in accordance with the approved switchgear submittals. As a result, the damages claimed by EMC are not a proper set-off against the amount it owes WESCO, and the Court rejects *Items 5 and 6* in their entirety.

67.     Even though the Court rejects entirely EMC's claims for a set-off regarding the "orientation" issue for substation 4, the Court will address the amounts of the claimed damages, which seriously impacted the credibility of Mr. Roseman's testimony.

68.     In *Item #6,* EMC claimed that it was backcharged $29,561.38 by American Bridge to demolish and reconstruct the concrete pad for substation 4. EMC Ex. 20 was submitted in support of that claim. That exhibit is Change Order #13 from American Bridge to EMC which purports to deduct, *inter alia*, $29,561 for the demolition and reconstruction of the pad for substation 4. It is not signed. Mr. Roseman testified during his deposition in August 2006 that he did not agree with that change order and was contesting it and, as a result, that he had not signed it. However, at trial Mr. Roseman was presented with WESCO Ex. 81 during his cross examination. That exhibit is another copy of Change Order #13, but it bears Mr. Roseman's signature on behalf of EMC and is dated 12 November 2004. Perhaps Mr. Roseman signed that

change order after his deposition in August 2006 and backdated his signature to 2004, but the matter casts doubt on his credibility.

69.     In *Item #5*, EMC claims it incurred costs of $39,951.77 for electrical work which had to be done as a result of tearing out and rebuilding the pad for substation 4.  Mr. Roseman testified that the amount claimed consisted of  five separate items:

> 1)     $1,861 to repull and reterminate wire
>
> 2)     $16,031.12 to repipe sub 4 primary
>
> 3)     $14,204.94 to pull new primary and reterminate
>
> 4)     $4,738.71 to repipe secondary
>
> 5)     $2,186 to reset all gear on pad 4, including crane rental

These five items total $39,021.77, which is $930 less than the amount claimed by EMC in *Item #5*. The Court finds that EMC did not prove these claimed damages with any reasonable degree of certainty.

70.     The only evidence offered to support the amount of the damages claimed in *Item #5* was the testimony of Mr. Roseman, which the Court finds was neither reliable nor credible.    Initially, Mr. Roseman testified that these items were based upon his "estimates." Later, he amended his testimony and stated that these were EMC's actual costs. These five items include charges for labor, materials and equipment.  However, no invoices or receipts were introduced to support any of the claimed charges for materials and equipment.  EMC did not introduce any records or documents or checks to show that it paid any of the alleged charges for materials and equipment.  There were no time records or payroll records introduced by EMC to

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

support its alleged labor charges. In short, EMC did not introduce any records or documentary evidence to support any of these alleged charges. The only witness who testified about these alleged charges was Mr. Roseman, and the Court cannot accept his testimony about these matters as reliable.

71.    The evidence further showed that the amounts about which Mr. Roseman testified were not the actual costs incurred by EMC but, rather, included substantial markups. For example, Mr. Roseman testified that for the purpose of devising these figures he was using $65 per hour for the time of his supervisor, Mr. Mitchell Harrell. However, the payroll records which EMC submitted to the U.S. Department of Labor for the Project reflect that Mr. Harrell's rate of pay was $23.75 per hour. (WESCO Ex. 82). The evidence shows, and the Court finds, that the figures presented by Mr. Roseman at trial included similar markups for the labor of other EMC personnel as well. The figures submitted by Mr. Roseman at trial also included markups for overhead and profit.

72.    The Court finds that the amounts testified to by Mr. Roseman at trial were not the actual costs incurred by EMC. Rather, the amounts claimed were substantially inflated over EMC's actual costs. EMC failed to prove its actual costs with the required degree of reasonable certainty, and failed to introduce any documentary evidence or other testimony to support Mr. Roseman's testimony.

73.    The Court finds that *Items 5 and 6* totaling $69,513.15 are not proper set-offs against the amount owed by EMC to WESCO, and the Court rejects those claims by EMC.

*ITEM 8: SUPPLY LUG FOR TERMINATION L.V. - $9,032.46*

74.     WESCO claims that it is entitled to a set-off in the amount of $9,032.46 because WESCO was required to supply lugs for the switchgear but failed to do so, as a result of which EMC purchased the required lugs from Rexel Consolidated Electrical Supplies.  Rexel invoiced EMC $9,032.46 for those lugs.  (EMC Ex. 23).  WESCO's position on this claim is that it cannot prove that the lugs were delivered with the equipment as required, and therefore WESCO is not in a position to dispute the claim that the required lugs were not delivered with the equipment. However, WESCO claims that EMC was required to give notice of the missing lugs to WESCO in order to permit WESCO the opportunity to cure that deficiency.  EMC counters with the contention that the requisite notice and opportunity to cure was given to WESCO and Eaton/Cutler-Hammer, and that they still failed to supply the missing lugs.

75.     The Court finds that the lugs were required to be delivered to EMC as part of the original Purchase Order, and that the lugs were not provided to EMC by WESCO or by Eaton/Cutler-Hammer.   The Court finds that EMC ordered lugs from Rexel Consolidated Electrical Supplies on October 14, 2004, that they were shipped by Rexel to EMC on October 18, 2004, as reflected in EMC Ex. 23, and that Rexel invoiced EMC $9,032.46 for the lugs.

76.     The Court cannot accept the testimony of Mr. Roseman that he gave WESCO and/or Eaton/Cutler-Hammer notice that the lugs were missing and an opportunity to cure before EMC ordered the lugs from Rexel.  Mr. Roseman was so evasive, speculative, and vague on so many issues that the Court cannot accept his unsubstantiated testimony that he gave notice before ordering the lugs.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

77.     EMC Ex. 23 reflects that EMC ordered the lugs from Rexel on October 14, 2004 and they were shipped by Rexel to EMC on October 18, 2004. The only documentary evidence of any notice by EMC to WESCO or Cutler-Hammer with respect to the missing lugs is EMC Ex. 12, which is a November 10, 2004 letter from EMC to WESCO with a copy to Mr. Bob Gaitens. Paragraph 3(d) states:

> "Per submittals, the lugs for secondary were supposed to be installed with the equipment at time of delivery. Due to the lack of lugs, EMC had to purchase and install the lugs." (EMC Ex. 12).

EMC's November 10, 2004 letter to WESCO and Eaton/Cutler-Hammer regarding the missing the lugs is dated almost one month after EMC ordered the lugs from Rexel. The letter does not state that any prior notice of the missing lugs had been given by EMC. Although Mr. Roseman testified that there was other written documentation showing earlier notice by EMC to WESCO and Eaton/Cutler-Hammer that the lugs were missing, none of that alleged documentary evidence was introduced. The Court rejects Mr. Roseman's testimony and finds that EMC did not give WESCO or Eaton/Cutler-Hammer notice of the missing lugs before EMC ordered the lugs on October 14, 2004. The Court further finds that the first notice given by EMC of the missing lugs was in EMC's November 10, 2004 letter. (EMC Ex. 12). The Court finds that *Item #8* is not a proper set-off against the amount owed by EMC to WESCO because EMC did not give notice of the missing lugs and did not give WESCO or Eaton/Cutler-Hammer the opportunity to supply those lugs before EMC obtained them from another source.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

### ITEM 12: OVERCURRENT PROTECTION - $9,542.20

78.     This claim pertains to six of the Basler relays which were shipped by Eaton/Cutler-Hammer in the switchgear to the job site. Six of those Basler relays subsequently became corroded beyond repair and had to be replaced by EMC at a cost of $9,542.20. EMC Ex. 111 is the order acknowledgment by Basler Electric Company to EMC dated May 20, 2005 showing that the six new Basler relays cost $9,542.20. EMC Ex. 102 is the June 8, 2005 memorandum from Basler Electric Company, to whom the six relays had been returned, stating that the six relays "show significant salt deposits and other evidence of standing water on their circuit boards," that they "show significant corrosion of some metal parts, both internally and externally," and that they cannot be repaired.

79.     The question for decision on this item is whether EMC or WESCO should bear the cost of replacing those six Basler relays. The Court finds that the corrosion and damage to the six Basler relays was caused by EMC's improper handling of the equipment, and therefore EMC must bear the expense of replacing those six relays. The Court finds that the cost of replacing the six relays is not a proper set-off against the amount owed by EMC to WESCO.

80.     Mr. Harrell testified that he was present when the equipment was delivered to the job site. He testified that the equipment was delivered on flat bed trucks and that the equipment was covered by tarps which protected the equipment from water intrusion during transit. He inspected the equipment when it arrived. He did not find any evidence of water intrusion or corrosion or damage to the Basler relays when they were delivered. The Court

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

accepts Mr. Harrell's testimony as truthful that the Basler relays arrived at the job site in good condition without water intrusion or corrosion.

81.     The Court finds that EMC did not properly protect and care for the equipment after it arrived at the job site.   During his cross examination, Mr. Harrell was shown a photograph of the equipment after it arrived at the job site. The tarp had been removed and the equipment, including the Basler relays, were left open and exposed to the elements, including water intrusion.  In fact, there were puddles of water shown in the photograph on the ground around the open and exposed equipment. The Court finds that after the equipment arrived at the job site, EMC did not properly care for the equipment and left it exposed to the elements, including water intrusion, on the Navy pier in Key West..

82.     Mr. Harrell testified that the equipment was delivered with the instruction manual for handling the equipment taped inside the equipment for each of the four substations.  That manual was introduced as WESCO Ex. 16.  It contains instructions for the proper care and handling of the equipment.  The manual instructs the user to protect the equipment from moisture and dampness.  For example, Section 2.4 of the manual states in part:

"An indoor switchgear assembly which cannot be installed and put into service immediately should be stored in a dry and clean place, preferably indoors in a heated building.  Conditions such as dampness, changes in temperature, dirty or corrosive atmospheres should be carefully avoided.  Special precautions are required if the indoor assembly is to be stored outdoors.  The assembly must be kept clean, well ventilated, and warm enough to prevent condensation.  It will be necessary to cover the assembly and install temporary heating equipment.  Approximately 250 watts per vertical section are required for average conditions.  Outdoor storage of indoor equipment, even for a brief period, is not recommended and should be avoided.  The covering provided during shipment for indoor assemblies is **NOT** adequate for outdoor storage." (WESCO Ex. 16, p. 6) [Emphasis in original].

83.     The manual further instructs the user to treat outdoor assemblies the same as indoor

assemblies until the equipment is fully assembled.  For example, Section 2.1 of the manual states:

"Outdoor assemblies are not weatherproof until completely assembled.  Treat them the same as indoor equipment until fully assembled." (WESCO Ex. 16, p.4).

Similarly, Section 2.4 of the instruction manual states:

"Outdoor assemblies which are not fully assembled must be treated in the same manner as indoor equipment." (WESCO Ex. 16, p.7).

84.     The instruction manual also instructs the user to energize the space heaters provided

with the equipment while the equipment is stored before installation to prevent condensation of

moisture inside the assembly.  Section 1.5 of the manual provides:

"If an outdoor assembly is to be stored prior to installation, provisions must be made for energizing the space heaters to prevent condensation of moisture inside the assembly." (WESCO Ex. 16, p.3).

Similarly, Section 2.4 of the manual provides instructions to the user to energize the space heaters

while the equipment is in storage:

"The space heaters, which are standard with weatherproof assemblies, must be energized to prevent condensation." (WESCO Ex. 16, p.7).

85.     Mr. Harrell admitted that it is important to energize the space heaters to keep

moisture out, but he candidly admitted that EMC did not energize the space heaters during the time the equipment was being stored by EMC on the Navy pier before the equipment was assembled. The Court finds that EMC's failure to properly care for the equipment after it was delivered resulted in the water intrusion, corrosion and damage to the six Basler relays which had to be replaced, and that the cost of replacement is not a proper set-off.

86.     During trial, EMC contended that Eaton/Cutler-Hammer, and therefore WESCO, should bear the responsibility for the six corroded Basler relays because Eaton/Cutler-Hammer selected those relays to be used in the switchgear, that the selection of those relays was not approved by the Navy, and that the six relays became corroded because they were not appropriate for the environment. The Court rejects that contention because it is contrary to the evidence.

87.     As Mr. Gaitens testified, the Eaton/Cutler-Hammer submittals for the electrical switchgear did specify that the Basler relays in question would be used, and the submittals included the Basler Electric Company manual for those relays. URS did approve the Eaton/Cutler-Hammer submittals for the electrical switchgear. The approved submittals became part of the specifications and therefore Eaton/Cutler-Hammer was required to provide the Basler relays in question with the switchgear.

### ITEM 15: LIGHTNING ARRESTERS - $10,150.90

88.     Both parties agreed, and the Court finds, that the Navy specifications required 15KV lightning arresters. These arresters are referred to as "rubber goods" and were not part of the original Purchase Order between EMC and WESCO.

89.     EMC attempted to order the 15KV lightning arresters from WESCO, but WESCO did not have them. As a result, EMC attempted to obtain the required 15KV lightning arresters from several other supply houses, but was unable to locate a supply house which stocked that item.

90.     Several of the supply houses, however, had 18KV lightning arresters, including

WESCO. EMC consulted with a third party, the Van Smith Company, which advised EMC that the

Navy would accept 18KV lightning arresters in place of the specified 15KV lightning arresters.

EMC never made any inquiry to the Navy or its engineers for the Project as to whether the 18KV

lightning arresters would be a suitable replacement. EMC nevertheless purchased and furnished

18KV lightning arresters for the job, which were ultimately rejected by the Navy engineers, who

insisted that the 15KV lightning arresters called for in the plans and specifications be provided.

91.     EMC seeks to set-off $10,150.90 for this item against the amount it owes WESCO

on the unpaid invoices. The Court finds this is an improper set-off and rejects EMC's claim for this

item.

92.     The Court finds that it was EMC's responsibility to furnish the specified lightning

arresters. It was not WESCO's responsibility. EMC furnished the improper lightning arresters

based upon the advice of a third party, not WESCO and not Eaton/Cutler-Hammer.

93.     The document introduced by EMC to support the amount of its claim for this

item further demonstrates the problem the Court has with Mr. Roseman's credibility. For example,

Mr. Roseman testified at trial that it took two men and 15 trips to Key West to correct the lightning

arrester problem. Yet, in his deposition, Mr. Roseman testified it took one man two trips to Key

West to correct the problem.

94.     EMC Ex. 73 was introduced by EMC in support of this claim. Mr. Roseman's

March 9, 2006 letter to American Bridge, which is part of EMC Ex. 73, states "it will take less than

a hour finish completely" to correct the lightning arrester problem. Yet, in his March 8, 2006 letter

to Mr. Greg Shade of WESCO, which is also part of EMC Ex. 73, Mr. Roseman states it will take

one man three days to correct the problem. Mr. Roseman's March 8, 2006 letter lists various items

allegedly comprising EMC's claim in the amount of $10,150.90 for this item, but there is no documentation to support any of those items. There are no invoices, no receipts, no cancelled checks, no time records and no other documentary support. And the claimed charge includes 15% overhead and profit, which the Court also finds would be improper.

95.     While the Court finds that the lightning arrester problem was EMC's fault and not the fault of WESCO or Eaton/Cutler-Hammer, and therefore is not a proper set-off, the Court further finds that the amount of the claim itself is not properly supported and that Mr. Roseman's testimony at trial, as noted above, was inconsistent with his deposition testimony and with EMC Ex. 73.

<u>ITEM 19: ADDITIONAL HOME OFFICE - $9,375</u>

96.     As noted in Finding of Fact 24 above, EMC claimed a set-off in the amount of $23,955 for this item at the beginning of the trial, but conceded at the conclusion of the trial that there was no evidence to support any amount for this item except $9,375 consisting of extra time allegedly spent by Mr. Roseman dealing with the alleged deficiencies in the equipment. The Court finds that EMC failed to carry its burden of proof with respect to this claim.

97.     Mr. Roseman testified that he spent numerous hours dealing with the alleged deficiencies in the equipment. He estimated that he spent 75 hours which he claimed should be a proper set-off against the amount owed by EMC to WESCO. He testified that he keeps track of his time on a pad, but that pad was not introduced into evidence nor was any other evidence introduced to support Mr. Roseman's claim that he spent 75 hours. Moreover, Mr. Roseman initially testified that he does not know what hourly rate he normally bills for his time. Later, Mr. Roseman testified that the proper charge for his time should be $125 per hour.

98.     The Court rejects Mr. Roseman's testimony in this regard and finds that it was

vague, speculative, not reliable and not credible. EMC failed to carry its burden of proof with respect to this item, and the Court finds that it is not a proper set-off against the amount owed by EMC to WESCO.

## *DOOR HOLDER - $9,633.29*

99. As noted in Finding of Fact 18 above, this item was not listed in EMC's submission at commencement of the trial as one of the 19 items to be tried, but was nevertheless tried and submitted to the Court for decision. EMC claims that it is entitled to a set-off in the amount of $9,633.29 for this item. The Court finds that EMC did not carry its burden of proof with respect to this item, and rejects EMC's claim for a set-off in this amount.

100. The only evidence introduced by EMC to support this claim was the testimony of Mr. Roseman. Mr. Roseman's testimony was premised upon a document he prepared in March 2006, months after the commencement of this litigation. That document was never presented to WESCO by EMC during discovery, and the first time WESCO's counsel saw that document was during trial when it was shown by EMC's counsel to Mr. Roseman to "refresh his recollection." That document was not introduced into evidence.

101. The claim for this item included labor and material, but again no invoices, receipts, time records or any other evidence, documentary or otherwise, was introduced to support this claim other than the testimony of Mr. Roseman. The Court finds that the testimony of Mr. Roseman on this item was vague, speculative, unreliable and not credible. The Court finds that EMC failed to carry its burden of proof with respect to this item. The Court rejects this claim and finds that it is not a proper set-off against the amount owed by EMC to WESCO.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

### *SHIPPING DAMAGE*

102.     As noted in Finding of Fact 18 above, this was the second of the two items which were not contained in EMC's list of 19 items submitted at the commencement of the trial to be tried, but nevertheless was tried and submitted to the Court for decision. The Court finds that EMC did not carry its burden of proof with respect to this item.

103.     Mr. Mitchell Harrell did testify that there was some damage to the equipment when it was delivered to the job site and that the damage was caused during shipment. Mr. Harrell testified that when the equipment was delivered there were three specific items of damage caused to the equipment during shipment, specifically, one of the roof panels was bent, one of the floor panels was damaged, and the brackets for two transformers had broken off. EMC Ex. 67 contains photographs showing the bent roof panel. It was apparently damaged during shipment. Mr. Harrell testified that EMC straightened the roof panel using a port-a-jack and timbers. The repairs were minor in nature and did not require any substantial time.

104.     Mr. Harrell testified that he took photographs of the brackets for the two transformers, which brackets had broken during shipment. But those photographs were not introduced into evidence. Mr. Harrell testified that the broken brackets were reported to Eaton/Cutler-Hammer and that Eaton/Cutler-Hammer sent replacement brackets to EMC. Mr. Harrell estimated that two to three hours of labor was required to install the replacement brackets for each of the two transformers.

105.     The Court accepts Mr. Harrell's testimony with respect to these items of damage which were caused during shipment. The Court also finds that the amount of damage caused to the equipment during shipment was very minor in nature, and was repaired by EMC in just a few hours.

106.    EMC did not introduce any evidence that it made a claim against the transportation carrier for these minor items of damage caused during transportation.  The Court finds that it was EMC's responsibility to make the claim against the carrier for the damage caused during shipment. Section 2.2 of the instruction manual delivered with the equipment instructed EMC to immediately file a claim against the transportation company for any damage caused during shipment:

> "Equipment shipped from the factory is carefully packed and inspected prior to its departure.  On occasion, however, equipment damage is incurred during transportation.  If any damage is found, file a damage claim immediately with the transportation carrier and notify a Cutler-Hammer representative.  All claims should be filed as soon as possible and include applicable part numbers, shop order numbers and/or general order numbers.  (WESCO Ex. 16, p.4).

107.   The Court finds that EMC did not make a claim against the transportation company as required for the damage caused during shipment.  The Court finds that EMC is not entitled to a set-off from the amount it owes WESCO for the shipping damage.  The Court further finds that, even if EMC were entitled to a set-off for this item, EMC failed to carry its burden of proof of establishing the amount of that damage with the required reasonable degree of certainty.

108.    Mr. Harrell also testified that when the equipment was delivered there were some loose nuts and bolts and in the bottom of the equipment and on the flat bed truck, and those items are depicted in photographs numbered 89.4, 89.5, 89.6 and 89.7 of EMC Ex. 67.  Mr. Harrell also testified that the equipment was delivered with boxes and bags, which were intact, containing nuts and bolts to assemble the equipment.  Mr. Harrell testified, and the Court finds, that there was no damage to the switchgear from the loose nuts and bolts depicted in the photographs, and EMC is not entitled to any set-off with respect to that.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

## CONCLUSIONS OF LAW

109.    This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332 because: (1) there is complete diversity of citizenship between Intervenor/Plaintiff EMC and Defendant in Intervention/Counterclaimant WESCO, and (2) the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

110.    Venue properly lies in the United States District Court for the Southern District of Florida.

111.    WESCO did not breach the agreement between it and EMC (the "EMC-WESCO contract"). WESCO performed under the contract by providing switchgear in accordance with the Navy specifications for the Project, the approved submittals and with the knowledge and approval of EMC.

112.    EMC breached the EMC-WESCO contract because it failed to pay the balance owed for equipment and materials furnished by WESCO to EMC pursuant to the EMC-WESCO contract.

113.    To the extent EMC claims it is entitled to a set-off of the contract balance owed to WESCO, EMC is entitled only to recover damages / set-offs which would place EMC in the same position it would have been in had the equipment and materials supplied by WESCO conformed. *See, e.g., Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F.Supp.2d 1319, 1337 (S.D. Fla. 2004)(underlying purpose of breach of contract damages is to place the non-breaching party in same position it would have been in but for the breach); *Telemundo Network, Inc. v. Spanish Television Svcs., Inc.* 812 So. 2d 461, 464 (Fla. 3rd DCA 2002)(damages in breach of contract action are intended to place injured party in same position he/she would have been in had the breach not occurred); *Plantation Key Developers, Inc. v. Colonial Mortgage Co. of Indiana, Inc.*, 589 F.2d

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

164, 169 (C.A.Fla. 1979)(non-breaching party has choice of recovering either loss of profits or damages which will put him in the same position as he was prior to making the contract).

114.    Pursuant to WESCO's agreement and there being no contest on the issue, EMC is entitled to a set-off in the amount of $22,419.35, representing the total of *Items 11, 13, 14, 16* and *17* on EMC's chart of alleged damages, submitted at trial on p. 3 of EMC's proposed findings of fact.

115.    The instructions supplied with the switchgear provided information to EMC on the proper care and storage of the switchgear. EMC was obligated to properly care for the switchgear after the equipment was delivered to EMC.

116.    EMC was negligent and/or assumed the risk in its handling of the subject switchgear. EMC was negligent in failing to properly care for, maintain or handle the switchgear. EMC was further negligent in its care and handling of the switchgear without knowledgeable and properly trained personnel and in failing to follow proper procedures for the care, handling and maintenance of the equipment.

117.    There is no credible or substantial evidence to support EMC's disputed damage allegations. *See, e.g., Centex-Rooney Construction Co. v. Martin County,* 706 So. 2d 20, 27 (Fla. 4th DCA 1997)(In case involving breach of construction contract, a recognized measure of damages is the reasonable cost of performing construction and repairs in conformance with the original contract's requirements....In such a case, the non-defaulting party must show *actual expenditures* occasioned by the breach....")(emphasis supplied).

118.    EMC concedes, and the Court concludes, that there is no evidence to support its claim for damages relating to *Items 1, 2, 3, 7, 9, 10* and *part of 19* on EMC's chart of alleged damages, submitted at trial on p. 3 of EMC's proposed findings of fact. EMC further concedes, and

the Court concludes, that any alleged damages with respect to *Item 18 (REPLACE MILD STEEL)* on EMC's chart, submitted at trial on p. 3 of EMC's proposed findings of fact, were caused by a third party, O.C. Door Company, and not WESCO, and therefore a set-off for these alleged damages is not proper.

119.    EMC failed to prove that its alleged damages relating to *Items 5 (PAD #4 ORIENTATION / LAYOUT), 6 (PAD #4 ORIENTATION / DEMO), 12 (OVERCURRENT PROTECTION / BASLER RELAYS)* and *15 (LIGHTNING ARRESTORS)* on EMC's chart, submitted at trial on p. 3 of EMC's proposed findings of fact, were the responsibility of WESCO. Specifically, any costs incurred by EMC with respect to these items were due to the fault and negligence of EMC, and not the fault of WESCO.

120.    EMC failed to provide credible evidence and, therefore, failed to carry its burden of proof with respect to its alleged damages relating to *Items 4 (CE TESTING), 19 (ADDITIONAL HOME OFFICE)* on EMC's chart, submitted at trial on p. 3 of EMC's proposed findings of fact, as well as the unlisted claim for the *DOOR HOLDER*.

121.    With respect to EMC's claim for *SHIPPING DAMAGE*, also an unlisted item, the Court concludes that, while the switchgear was not materially damaged upon its arrival at the jobsite and receipt by EMC, EMC bore the risk loss of any damage to the switchgear during transit, and any relief for damage during shipment should have been sought by EMC from the carrier. Fla. Stat. § 672.503, 672.504, 672.509(1). *See also, Ladex Corp. v. Transportes Aeroes Nacionales,* 476 So. 2d 763 (Fla. 3rd DCA 1985); *Pestana v. Karinol,* 367 So. 2d 1096 (Fla. 3rd DCA 1979). Moreover, EMC failed to prove with a reasonable degree of certainty the amount of damages EMC actually sustained as a result of the alleged *SHIPPING DAMAGE*.

122.    With respect to EMC's alleged damages relating to *Item 8 (LUGS)* on EMC's chart, submitted at trial at p. 3 of EMC's proposed findings of fact, the evidence proffered by EMC was not substantial or credible.  EMC failed to establish by a preponderance of the evidence that WESCO was ever given notice of the alleged lack of lugs or, it follows, an opportunity to cure. Therefore, this claim is not a proper set-off.

123.    Therefore, and as a result of EMC's breach of the EMC-WESCO contract, WESCO incurred damages in the amount of $282,034.35.

124.    WESCO, as the prevailing party, is entitled to recover its costs pursuant to Fed.R.Civ.P. 54(d)(1) and (2).

125.    WESCO, as the successful claimant, is entitled to pre-judgment interest. *See Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066-67 (11th Cir. 1996)(entitlement to pre-judgment interest is question of state law; Florida law provides for pre-judgment interest in breach of contract cases from date cause of action arises); *Argonaut Ins. Co., v. May Plumbing Co.*, 474 So. 2d 212 (Fla. 1985)(pre-judgment interest is an element of damages under Florida law).   The prevailing party in a breach of contract action is entitled to pre-judgment interest from the date of the breach. *Venn*, 99 F.3d at 1067.  Thus, WESCO is entitled to pre-judgment interest from the date of EMC's breach of the EMC-WESCO Agreement.

126.    The Court retains jurisdiction to assess the routine costs permissible in cases of this matter, and will further consider the matter of interest.

Case No. 05-10077 CIV-KING
Magistrate Barry L. Garber

## CONCLUSION

The Court finds that WESCO is entitled to recover the principal sum of $282,034.35 from EMC. This represents the unpaid balance in the amount of $304,453.70 for the equipment and materials which EMC purchased from WESCO, less $22,419.35 for the five items for which WESCO accepts responsibility. The Court finds in favor of WESCO and against EMC on each of the other items for which EMC claims it is entitled to a set off.

DONE AND ORDERED in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, FL this 8th day of February, 2007.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

−45−